# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DARNELL ROBERT BONNER,

        Plaintiff,

        v.                                     Case No. 05-C-1075

DAVID BETH, SGT. JOHNSON,
CAPTAIN PRESTON, CORPORAL WILLSTEAD,
CORPORAL REID, CORPORAL MCCALLISTER,
CORPORAL CORRAO, and SGT. OSCAR SALAS,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Darnell Robert Bonner, who is currently incarcerated at Green Bay Correctional Institution, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. The plaintiff is proceeding on an Eighth Amendment conditions of confinement claim based on allegations of denial of exercise and constant illumination while in segregation at the Kenosha County Jail, and an Eighth Amendment claim concerning the impact that the conditions in segregation had on his mental health. The November 15, 2005, amended complaint is the operative complaint in this action. Before the court is the defendants' motion for summary judgment.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General

Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the

2

existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

### 1. Background

The *pro se* plaintiff, Darnell Robert Bonner, filed his amended complaint under 42 U.S.C. § 1983 while an inmate at the Kenosha County Jail (Jail). (Amended Complaint ¶ I). He resided at the Jail at all times relevant to this action.

Defendant David Beth is the Kenosha County Sheriff (Affidavit of David G. Beth [Beth Aff.] ¶ 2). Defendant Hunter Johnson is employed by the Kenosha County Sheriff's Department as a corrections sergeant. (Affidavit of Hunter Johnson [Johnson Aff.] ¶ 2). Defendant Gary Preston is employed by the Kenosha County Sheriff's Department as the captain of the Detentions Division. (Affidavit of Gary Preston [Preston Aff.] ¶ 2). Defendant Raymond Willstead is employed by the Kenosha County Sheriff's Department as a corporal. (Affidavit of Raymond Willstead [Willstead Aff.] ¶ 2). Defendant James Reid is employed by the Kenosha County Sheriff's Department as a corporal. (Affidavit of James Reid [Reid Aff.] ¶ 2). Defendant Corporal McCallister is alleged to

---

[1] Facts are taken from the defendants' Proposed Findings of Fact and the two May 12, 2006, Affidavits of Darnell Bonner. Facts are also taken from the plaintiff's sworn complaint. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).

3

be a shift supervisor at the Jail. (Amended Complaint ¶ II. E.).  Defendant Thomas Corrao is employed by the Kenosha County Sheriff's Department as a corporal. (Affidavit of Thomas Corrao [Corrao Aff.] ¶ 2).  Defendant Oscar Salas is employed by the Kenosha County Sheriff's Department as a corrections sergeant. (Affidavit of Oscar Salas [Salas Aff.] ¶ 2).

The court permitted the plaintiff to proceed on claims that his conditions of confinement constituted cruel and unusual punishment under the Eighth Amendment. (Court's Order of January 9, 2006; Court's Order of November 14, 2005).  According to the amended complaint, the plaintiff spent "the majority of his pretrial detention in segregation due to his behavioral problems and mental illness." (Amended Complaint at 5).  The plaintiff alleges he "is a mentally ill inmate and has been diagnosed as having intermittent explosive disorder and sc[h]izophrenia and paranoid delusional." (Amended Complaint at 7).  He also alleges that he "had a difficult time handling the conditions of the extreme physical and social isolation and sensory deprivation" and that he "attempted to commit suicide while in segregation due to the harsh conditions." (Amended Complaint at 7).  The plaintiff alleges that there "are no out of cell activities what so ever." (Amended Complaint at 7).  He further alleges that detainees in segregation have "no recreation or exercise what so ever." (Amended Complaint at 9).  The plaintiff alleges that "cells remain illuminated 24 hours a day" and that the "light is so bright that it disturbs [his] sleep every day and every night." (Amended Complaint at 8).  Being "serious[ly] mentally ill," the plaintiff alleges that "the constant illumination disrupts his diurnal rhythm and add[s] to the sense of disorientation, especially when [Mr. Bonner did] not know the time of the day." (Amended Complaint at 8).  "The constant lighting creates a sense of lack of context and passivity and contributes to sleep problems and headaches that exacerbate the symptoms of mental illness." (Amended Complaint at 8).

4

The plaintiff alleges that confinement in segregation caused him "severe psychiatric morbidity, disability, suffering and mortality." (Amended Complaint at 8). He alleges that he "broke down so bad mentally from the affects solitude cause[s], that he tried to commit suicide." (Amended Complaint at 8). The plaintiff further alleges that the "conditions in isolation are so severe that they are 'toxic' to [him]" and that "the total isolation and inactivity deprived [him] of reality checks." (Amended Complaint at 8). He alleges that the conditions in confinement "exacerbate the symptoms that mentally ill inmates exhibit[]" and that such inmates receive "limited psychiatric support." (Amended Complaint at 9). The plaintiff claims that he "suffered intensified symptoms, whether command hallucinations and bizarre behavior." (Amended Complaint at 9).

## 2. Exhaustion of Administrative Remedies

Janice Bulanda is employed as a detentions system coordinator by the Kenosha County Sheriff's Department. (Affidavit of Janice Bulanda [Bulanda Aff.] ¶ 2). Ms. Bulanda is one of the custodians of records for the Jail. Ms. Bulanda reviewed the regularly kept files for the Kenosha County Detentions Systems and the exhibits attached to her affidavit were retrieved at her direction and represent true and correct copies of originals in the regularly kept records of the Jail. (Bulanda Aff. ¶ 4). The plaintiff's jail file reflects that he was detained at the Jail from August 3 to November 22, 2005. (Bulanda Aff. ¶ 5).

In his capacity as captain of the Detentions Division, and based on his experience, defendant Captain Preston is familiar with the manner in which inmates' files are regularly kept, as well as the rules, regulations, policies and practices governing inmates in the Kenosha County Detentions Division. (Preston Aff. ¶ 3). Captain Preston reviewed the Affidavits of Janice Bulanda and JoAnn Medley, R.N., made in the above-captioned litigation. (Preston Aff. ¶ 4). Based on Captain

Preston's experience, he recognizes exhibits to the Affidavits of Janice Bulanda and JoAnn Medley, R.N., to be documents regularly kept in the jail and medical files of inmates in the Jail. (Preston Aff. ¶ 5). Captain Preston, based on his experience, recognizes the exhibits to the Affidavits of Janice Bulanda and JoAnn Medley, R.N., to contain information recorded about and pertaining to the plaintiff in the above-captioned litigation, Darnell Bonner. (Preston Aff. ¶ 5).

The Inmate Rules, Regulations and Information Packet (Inmate Packet) sets forth the grievance procedure to be used by inmates at the Jail, and describes the proper forms to be used in this process. (Preston Aff. ¶ 7). The plaintiff received a copy of the Inmate Packet on August 3, 2005. (Bulanda Aff. ¶ 6, Ex. A). As indicated by his signature, the plaintiff acknowledged that it was his "responsibility to read and abide by the rules and regulations set forth in [the] handbook." (Bulanda Aff. ¶ 6, Ex. A).

Section VII of the Inmate Packet specifies that two forms are available for inmates to communicate information to staff. (Bulanda Aff. ¶ 7, Ex. B at 6; Preston Aff. ¶ 7). The "Inmate Request/Grievance Form" may "be used to submit a complaint, concern or convey information to a staff member. The request/grievance must be legible, on the proper form, signed, dated, and submitted without profanity." (Bulanda Aff. ¶ 7, Ex. B at 6; Preston Aff. ¶ 7). Section VII of the Inmate Packet directs that "written complaints and decision appeals are to be submitted in writing to the shift supervisor." (Bulanda Aff. ¶ 7, Ex. B at 7; Preston Aff. ¶ 7). Pursuant to the Inmate Packet procedures: "All complaints properly submitted will be reviewed by the applicable staff member. The legitimacy of each complaint will be determined and a response/resolution will be provided. Keep in mind that the complaint procedure is a vehicle for you to seek resolution for legitimate factual concerns." (Bulanda Aff. ¶ 7, Ex. B at 7; Preston Aff. ¶ 7).

Ms. Bulanda reviewed the jail grievances filed by the plaintiff. (Bulanda Aff. ¶ 8). Ms. Bulanda also reviewed the plaintiff's amended complaint brought under 42 U.S.C. § 1983 and the court order screening the amended complaint. (Bulanda Aff. ¶ 8). Ms. Bulanda determined that the plaintiff filed three grievances relating to the claims upon which the court permitted him to proceed.[2] (Bulanda Aff. ¶ 9). On October 4, 2005, the plaintiff filed a jail grievance relating to his claim that he was denied recreation. (Bulanda Aff. ¶ 10, Ex. C). In it, the plaintiff complained that being confined in isolation for more than 30 days without any form of recreation constituted cruel and unusual punishment. (Bulanda Aff. ¶ 10, Ex. C at 1). Mr. Bonner stated in this grievance: "I cannot exercise in my cell because I am issued shower thongs, which would make the exercising on the concrete floors in these cells difficult and dangerous." (Bulanda Aff. ¶ 10, Ex. C at 2).

The plaintiff filed a second grievance relating to recreation on November 14, 2005. (Bulanda Aff. ¶ 11, Ex. D). In this grievance, the plaintiff complained that his cell was "too small for jogging." (Bulanda Aff. ¶ 11, Ex. D at 1). He elaborated that "[a]ll it will accommodate is pacing or exercises such as sit ups or jumping jacks that inmates could do in their own cells." (Bulanda Aff. ¶ 11, Ex. D at 1).

Third, the plaintiff filed a jail grievance relating, in part, to cell illumination on October 5, 2005. (Bulanda Aff. ¶ 12, Ex. E). He complained that the "lights in the cells never goes off and [are]

---

[2] On August 31, 2006, the defendants filed a motion for leave to file supplemental summary judgment pleadings. According to the defendants, since the time Ms. Bulanda made her affidavit, additional documents related to the plaintiff's use of the grievance procedure have been identified. These newly identified documents, which were left out of the plaintiff's file due to an isolated clerical oversight, have since been incorporated into the plaintiff's file. Among the newly discovered grievances are two relating to the plaintiff's recreation claim, one relating to his cell illumination claim, and two relating to his claim that conditions of confinement exacerbated his mental illness. (Defs.' Supp. Br. at 2.) These materials will be discussed *infra*.

7

constant[ly] illuminated which forces me and other inmates to be [sic] something over our face[s]." (Bulanda Aff. ¶ 12, Ex. E at 1).

No grievances were filed by the plaintiff to specifically address his claim that the conditions of confinement in segregation exacerbated his symptoms of mental illness. (Bulanda Aff. ¶ 13). The plaintiff's November 14, 2005, jail grievance did state, in part, "By my being mentally ill[], I need exercise activity and time outside of my cell." (Bulanda Aff. ¶ 11, Ex. D at 1). This grievance also identified the specific exercises the plaintiff was in fact able to do in his cell. (Bulanda Aff. ¶ 11, Ex. D at 1.) The plaintiff's October 4, 2005, grievance asserted that the "conditions in the isolation cells is cruel and unusual." (Bulanda Aff. ¶ 10, Ex. C at 1). The only condition of confinement identified in this grievance is restricted recreation. (Bulanda Aff. ¶ 10, Ex. C). The grievance includes the plaintiff's statement that he could not exercise in his cell due to his footwear. (Bulanda Aff. ¶ 10, Ex. C at 1-2). The plaintiff's October 5, 2005, grievance relating to cell illumination made no reference to the illumination affecting the symptoms of his mental illness. (Bulanda Aff. ¶ 12, Ex. E at 1). Rather, he complained that cell lighting required him to place something over his face. (Bulanda Aff. ¶ 12, Ex. E at 1).

The plaintiff avers that he has exhausted all available administrative remedies, and the complaints that are not on file is the Jail's fault in that the complaints were destroyed, lost, or not found. (Affidavit of Darnell Bonner [Bonner Aff.] ¶ 7.)

### 3. Defendant Sheriff Beth

Defendant Sheriff David Beth is aware of the overall operations of the Jail. (Beth Aff. ¶ 3). He receives various reports and communications concerning the Jail from defendant Captain Preston and others. (Beth Aff. ¶ 4). Sheriff Beth occasionally makes rounds or checks of the Jail,

8

approximately once every few months.  (Beth Aff. ¶ 5).  Sheriff Beth was not involved in assigning the plaintiff to segregation.  (Beth Aff. ¶ 6).  Sheriff Beth does not recall any face-to-face encounters with the plaintiff.  (Beth Aff. ¶ 7).  He does not recall receiving any correspondence from the plaintiff.  (Beth Aff. ¶ 8).  Sheriff Beth's practice upon receiving correspondence from jail inmates is to read the letter and then forward it to Captain Preston for investigation, action or other response in his discretion.  (Beth Aff. ¶ 9).  Had Sheriff Beth received correspondence from the plaintiff, he would have followed this practice.  (Beth Aff. ¶ 10).

The plaintiff avers that he has written Sheriff Beth a letter concerning conditions of confinement at the Jail.  (Bonner Aff. ¶ 3.)

### 4. Recreation

Inmates in segregation cell assignments at the Jail pretrial facility are allowed out of their cells for one hour every day unless they are considered extremely dangerous.  (Preston Aff. ¶ 8).  The plaintiff was not considered extremely dangerous and would therefore have been allowed out of his segregation cell during this hour.  (Preston Aff. ¶ 9).  During their out-of-cell hour, segregation inmates may clean their cells or use the telephone.  (Preston Aff. ¶ 10).  This time may also be used to shower and exchange uniforms. (Johnson Aff. ¶ 3).  Inmates may also use their out-of-cell hour to move about in the common gangway between their segregation cells.  (Johnson Aff. ¶ 4; Preston Aff. ¶ 11).  The gangway is approximately 20 feet by 6 feet in size.  (Preston Aff. ¶ 11).  Inmates interact with each other and with staff in the gangway during the out-of-cell hour.  (Johnson Aff. ¶ 5).

The activities which are permitted during their out-of-cell hour all involve some degree of physical exertion.  (Johnson Aff. ¶ 6).  It is common for Jail staff to observe inmates engaging in

9

physical activities in their cells.  (Salas Aff. ¶ 3).  The plaintiff was observed engaging in a variety of exercises in his cell.  (Johnson Aff. ¶ 7).  Specifically, the plaintiff was observed doing push-ups, walking at a quick pace around his cell, doing sit-ups while wrapping his feet around the cell toilet for leverage, and using his cell bunk to support his weight while engaging in the arm exercises known as "dips."  (Johnson Aff. ¶ 8).

The plaintiff avers that he was informed by defendant Sgt. Johnson that the Jail does not give inmates recreation while housed in segregation.  (Bonner Aff. ¶ 5.)  The plaintiff further avers that while housed in segregation, he was never offered one hour a day out of his cell and he was not allowed to walk up and down the gangway.  (Bonner Aff. ¶ 9.)

## 5. Cell Illumination

The Jail cell lights are significantly dimmed during the nighttime hours. (Preston Aff. ¶ 12). The daytime lights use 34-watt fluorescent bulbs and the nighttime lights use 15-watt fluorescent bulbs.  (Preston Aff. ¶ 13).  Less than half the number of daytime bulbs are employed during the nighttime.  (Preston Aff. ¶ 14).  Cell lights throughout the Jail, including in segregation cells, are dimmed between the hours of 10:00 p.m. and 5:30 a.m.  (Preston Aff. ¶ 15; Salas Aff. ¶ 4; Johnson Aff. ¶ 9; Reid Aff. ¶ 3; Corrao Aff. ¶ 3).  The brighter cell lights are only employed during these hours if a matter of security or safety requires as much, however this is not a frequent occurrence. (Preston Aff. ¶ 16; Salas Aff. ¶ 5; Johnson Aff. ¶ 10; Reid Aff. ¶ 4; Corrao Aff. ¶ 4).  The nighttime cell lights are only as bright as is necessary for Jail staff to monitor the safety and security of the inmates and staff, including to ensure that inmates do not harm themselves or others.  (Preston Aff. ¶ 17; Salas Aff. ¶ 6; Johnson Aff. ¶ 11; Reid Aff. ¶ 5; Corrao Aff. ¶ 5).

10

Defendant Corporal Reid, who works second shift, observed the plaintiff sleeping in his segregation cell at times. (Reid Aff. ¶ 6). Defendant Corporal Corrao, who works third shift, observed the plaintiff sleeping in his segregation cell both during the nighttime and the daytime, when the brighter lights are employed. (Corrao Aff. ¶ 6). Occasionally, Corporal Corrao encountered the plaintiff awake during the night, but the plaintiff never complained that he could not sleep due to the nighttime cell lighting. (Corrao Aff. ¶ 7). Corporal Corrao recalls the plaintiff indicating that he would prefer to be housed in Zone 1 of the Jail where there are more lights and activity. (Corrao Aff. ¶ 8). Defendant Sergeant Johnson recalls having to wake the plaintiff up from his sleep to participate in disciplinary hearings. (Johnson Aff. ¶ 12). Maintaining total nighttime cell darkness would undermine the safety and security of the inmates and staff. (Preston ¶ 18). The Jail's nighttime lighting is maintained at a level compliant with the Administrative Code requirements that there be sufficient light to conduct security checks. (Preston Aff. ¶ 19; see also Wis. Admin. Code §§ 348.05(1)(c), 348.05(2)(d) and 350.05(6)(e)).

The plaintiff avers that the cell lights in segregation were never dimmed during his confinement in segregation at the Jail and that this caused him headaches and "sometimes blurry vision." (Bonner Aff. ¶ 6.) He also avers that the cell lights were so bright in segregation that it disturbed his sleep and caused him headaches. (Bonner Aff. ¶ 15.)

**6. Mental Health**

The officer transporting an individual to the Jail completes a "Transporting Officer Observation Summary" form prior to the inmate's intake and booking. (Preston Aff. ¶ 20). In addition to inquiring about the infectious disease status of the inmate, this form inquires of the transporting officer whether "the inmate exhbit[ed] any at risk or harmful behavior during the arrest

11

or transport." (Preston Aff. ¶ 21; Bulanda Aff. ¶ 14, Ex. F). The Transporting Officer Observation Summary form further inquires whether "the inmate [made] any suicidal gestures or statements during the arrest or transport." (Preston Aff. ¶ 22; Bulanda Aff. ¶ 14, Ex. F). Any affirmative answer to these questions "requires immediate notification of a Detention Division Supervisor." (Preston Aff. ¶ 23; Bulanda Aff. ¶ 14, Ex. F).

The plaintiff was booked into the Jail on August 3, 2005. (Bulanda Aff. ¶ 15, Ex. G). The transporting officer answered each of the questions on the Transporting Officer Observation Summary form in the negative. (Bulanda Aff. ¶ 14, Ex. F; Preston Aff. ¶ 24). At intake, a correctional officer at the Jail completes a "Medical/Mental Screening Visual Observation Report." (Preston Aff. ¶ 25; Bulanda Aff. ¶ 16, Ex. H). In addition to documenting any medical issues and any need for medical treatment of an inmate, this form documents behavioral observations. (Preston Aff. ¶ 26; Bulanda Aff. ¶ 16, Ex. H). If more than three of certain questions are answered in the affirmative, a supervisor must be notified. (Preston Aff. ¶ 27; Bulanda Aff. ¶ 16, Ex. H at 1). The form completed during the plaintiff's intake, indicates that he was not carrying any medications at the time and did not exhibit "behavior suggest[ing] need for immediate psychiatric treatment." (Preston Aff. ¶ 28; Bulanda Aff. ¶ 16, Ex. H at 1). At intake, the plaintiff's behavior was not observed to be any of the following: assaultive, violent, angry, hostile, loud, obnoxious, uncooperative, depressed, anxious, or afraid. (Preston Aff. ¶ 29; Bulanda Aff. ¶ 16, Ex. H at 1-2). The plaintiff was further observed not to be unusually suspicious, exhibiting bizarre behavior, seeing visions, hearing voices, or marked by scars of self-inflicted injuries. (Preston Aff. ¶ 30; Bulanda Aff. ¶ 16, Ex. H at 1-2). Additionally, the plaintiff's behavior at intake was not marked by a blank stare,

passivity, confusion, or a withdrawn or lifeless reaction. (Preston Aff. ¶ 31; Bulanda Aff. ¶ 16, Ex. H at 2).

Upon booking of an inmate, an Admission Release Specialist completes a "Medical/Mental Screening Medical Questionaire" form. (Preston Aff. ¶ 32). If several questions are answered in the affirmative or if any questions relating to an inmate's suicide risk are answered in the affirmative, a supervisor must be notified. (Preston Aff. ¶ 32; Bulanda Aff. ¶ 17, Ex. I at 1). In addition to being asked whether they have experienced certain stressful life events, inmates are asked whether they have "ever been in a mental institution or had psychiatric care." (Preston Aff. ¶ 33; Bulanda Aff. ¶ 17, Ex. I at 1). Inmates are asked whether they have "ever attempted or contemplated suicide" and whether they are contemplating suicide at that time. (Preston Aff. ¶ 34; Bulanda Aff. ¶ 17, Ex. I at 1). Inmates are asked whether they are "currently seeing a mental health worker/case manager/social worker/psychologist/counselor/psychiatrist." (Preston Aff. ¶ 35; Bulanda Aff. ¶ 17, Ex. I at 1). In addition, the Admission Release Specialist records their observation as to whether the "inmate's behavior suggest[s] a risk of suicide." (Preston Aff. ¶ 36; Bulanda Aff. ¶ 17, Ex. I at 1). Mr. Bonner answered each of these questions related to his mental health history in the negative. (Preston Aff. ¶ 37; Bulanda Aff. ¶ 17, Ex. I at 2). The Admission Release Specialist did not observe the plaintiff's behavior at booking to suggest a risk of suicide. (Preston Aff. ¶ 38; Bulanda Aff. ¶ 17, Ex. I at 1-2). The "Medical/Mental Screening Medical Questionaire" form advises inmates that answers supplied "assist [the] department and medical personnel from the Kenosha County Sheriff's Department Detentions Division in providing necessary care and treatment." (Preston Aff. ¶ 39; Bulanda Aff. ¶ 17, Ex. I at 1). It further advises that refusal to answer or untruthful answers "to these medical

13

questions may delay delivery of proper treatment." (Preston Aff. ¶ 40; Bulanda Aff. ¶ 17, Ex. I at 1). The plaintiff signed his completed form. (Preston Aff. ¶ 41; Bulanda Aff. ¶ 17, Ex. I at 2).

Inmates are told at booking that they may access various psychiatric services just by telling an officer of their needs. (Salas Aff. ¶ 7). Nursing staff is available at the jail 24 hours per day. (Preston Aff. ¶ 42). A medical doctor is in the facility one day per week. (Preston Aff. ¶ 43). Mental health care provided by Dr. O'Keefe and Dr. Caldwell is available 20 hours per week. (Preston Aff. ¶ 44). Their primary responsibilities include identifying suicide risks and serious mental illness. (Preston Aff. ¶ 45). Drs. O'Keefe and Caldwell can recommend treatment by a psychiatrist or detention under Chapter 51 of the Wisconsin Statutes. (Preston Aff. ¶ 46). Other mental health resources available to inmates include Crisis Workers, whom an inmate can request an officer to call or whom an officer may act independently to call if a need is perceived. (Preston Aff. ¶ 47). Inmates may also speak to the Jail pastor or Sister Ginny, who can help refer the inmate to other services. (Preston Aff. ¶ 48).

Inmates at the Jail receive housing assignment and security classifications which are initially made using a computer algorithm. (Preston Aff. ¶ 49). The classifications are reviewed every 30 days. (Preston Aff. ¶ 50). Classifications are based on consideration of such factors as behavior during previous detentions in the Jail, the offense for which the inmate is being held, behavior and compliance during the subject incarceration and medical needs, among others. (Preston Aff. ¶ 51). The lower their classification, the more restrictive an inmate's housing assignment will be. (Preston Aff. ¶ 52). Conversely, the higher their classification, the less restrictive an inmate's housing assignment will be. (Preston Aff. ¶ 53). For example, an inmate with a very low classification may be housed in a six-cell unit with an attached day-room and gangway, while an inmate with a very

14

high classification may be appointed as an inmate trustee or assigned to a work crew. (Preston Aff. ¶ 54). Inmates are assigned to segregation cells for three reasons: administrative, medical or for purposes of maintaining a suicide watch. (Preston Aff. ¶ 55). Medical segregation is for increased observation, care or quarantine. (Preston Aff. ¶ 56). Suicide watch is for increased observation and control or containment of potential hazards. (Preston Aff. ¶ 57).

The plaintiff was not charged with a major crime, and was detained on a probation and parole hold. (Preston Aff. ¶ 58). His cell assignments reflected his lack of compliance with Jail rules and also his changing need for observation, security and monitoring. (Preston Aff. ¶ 59). Although there are no clocks in segregation cells, life in segregation is very structured. (Preston Aff. ¶ 60). An inmate could keep track of time by marking the occurrence of such things as the passing of medications, shift changes, and service of meals. (Preston Aff. ¶ 61). Segregation cells have a window in their door looking out to the gangway. (Salas Aff. ¶ 8). An inmate may be able to see the inmate in the cell across from his own. (Salas Aff. ¶ 9). In addition, segregation inmates interact with one another during their out-of-cell hour. (Johnson Aff. ¶ 13). Segregation cells do not have windows to the outside of the jail building due to their physical situation in the building. (Preston Aff. ¶ 62).

JoAnn Medley, R.N. is a nursing supervisor at the Jail. (Affidavit of JoAnn Medley, R.N. [Medley Aff.] ¶ 2). She is one of the custodians of the plaintiff's jail medical records. (Medley Aff. ¶ 3). In her capacity as nursing supervisor, and based on her experience as a R.N., JoAnn Medley is familiar with the manner in which the jail medical records of inmates of the Jail are maintained and their content. (Medley Aff. ¶ 4). JoAnn Medley, R.N., has reviewed the regularly kept medical

15

files of the Jail and the exhibits attached to her affidavit were retrieved at her direction, and represent true and correct copies of the originals in the regularly kept records of the Jail. (Medley Aff. ¶ 5).

On September 19, 2005, the plaintiff authorized release of his mental health records from several prior treatment providers. (Medley Aff. ¶ 6, Ex. J). These records reflected prior diagnoses of mental illness. (Medley Aff. ¶ 7). After the requested records were received, Dr. O'Keefe placed the plaintiff on a suicide watch on September 28 which was discontinued on October 3, 2005. (Preston Aff. ¶ 63; Medley Aff. ¶ 8, Ex. K). On October 5, 2005, the plaintiff notified the medical staff that he would be refusing to eat or drink anything. (Medley Aff. ¶ 9, Ex. L). The strike coincided with his participation in the Ramadan fast. (Reid Aff. ¶ 7). On the same day, the plaintiff threatened to break a light fixture and cut himself. (Medley Aff. ¶ 10, Ex. M). Corporal Kaiser called a crisis worker to speak to the plaintiff. (Medley Aff. ¶ 11, Ex. N). The record of the crisis worker's visit with the plaintiff contains her note that the plaintiff knew he needed to remain in segregation, though it was lonely. (Medley Aff. ¶ 12, Ex. N at 2). The crisis worker "recommended that [Mr. Bonner] remain in segregation with regular 30 minute checks. No reassessment is needed." (Medley Aff. ¶ 13, Ex. N at 2). The plaintiff was moved to a cell appropriate for monitoring his food intake. (Johnson Aff. ¶ 14).

On October 7, 2005, defendant Corporal Reid was informed by Sister Ginny that the plaintiff wished to speak to a crisis worker. (Reid Aff. ¶ 8). A crisis worker was called. (Reid Aff. ¶ 8). Before the crisis worker arrived, a correctional officer discovered the plaintiff with a bed sheet tied around his neck and the cell bars. (Reid Aff. ¶ 9). Corporal Reid, among others, assisted in responding. (Reid Aff. ¶ 10). The plaintiff was conscious and breathing as the bed sheet was removed. (Reid Aff. ¶ 11). The plaintiff received immediate medical attention from the Health

16

Services Unit and his pulse/oxygen level was normal. (Reid Aff. ¶ 12). The crisis worker arrived, spoke with the plaintiff and recommended that the plaintiff be placed on a suicide watch. (Reid Aff. ¶ 13; Medley Aff. ¶ 14, Ex. N). This watch was initiated. (Reid Aff. ¶ 15; Medley Aff. ¶ 14, Ex. N, ¶ 15, Ex. O). The plaintiff was reassessed by a crisis worker on October 8, 2005. (Reid Aff. ¶ 16; Medley Aff. ¶ 16). Based on the crisis worker's recommendation, the suicide watch was continued. (Reid Aff. ¶ 17; see Medley Aff. ¶ 15, Ex. O).

On October 9, 2005, the plaintiff voluntarily resumed eating and drinking. (Corrao Aff. ¶ 9). The plaintiff was seen by Dr. O'Keefe approximately every 48 hours between October 10 and October 18, 2005. (Medley Aff. ¶ 17). On October 18, 2005, the plaintiff was removed from suicide watch and continued to be housed in segregation to serve disciplinary sanctions. (Medley Aff. ¶ 18; Preston Aff. ¶ 64).

The plaintiff avers that he "never went on a hunger strike for religious purposes." (Bonner Aff. ¶ 10.) Rather, he went on hunger strike due to the harsh conditions in segregation. *Id.* The plaintiff does not recall telling the booking officer about his mental health history, denying such history, or being asked about such history. (Bonner Aff. ¶ 11.) The plaintiff avers that he attempted suicide twice while housed in segregation, due to the cruel and unusual punishment he was subjected to. (Bonner Aff. ¶ 12.) He has a history of mental illness and has been in numerous mental health institutions. (Bonner Aff. ¶ 13.) The plaintiff avers that he suffered physically, mentally, and emotionally from the solitary confinement while housed in segregation at the Jail. (Bonner Aff. ¶ 14.)

17

**ANALYSIS**

The defendants contend that, 1) the plaintiff did not exhaust administrative remedies prior to bringing suit; 2) the plaintiff has not alleged the personal involvement of Sheriff David Beth; 3) the plaintiff was not denied constitutionally adequate recreation; 4) the plaintiff was not subjected to unconstitutional cell illumination; 5) the plaintiff cannot meet his burden to show that conditions of confinement exacerbated his symptoms of mental illness; 6) the plaintiff cannot establish causation; and 7) they are entitled to qualified immunity. The plaintiff contends that, 1) he has exhausted his administrative remedies; 2) Sheriff Beth should not be dismissed; 3) he was denied recreation and out of cell exercise; 4) he was subjected to unconstitutional cell illumination; 5) conditions of confinement exacerbated his symptoms of mental illness; and 6) the defendants are not entitled to qualified immunity.

**1. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in

18

accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S.Ct. 2378, 2384, 2387 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

The defendants contend that the plaintiff's grievances did not sufficiently alert the defendants to the nature of the plaintiff's claims and therefore, he did not exhaust administrative remedies. A purpose of the exhaustion requirement is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *see also Smith v. Zachary*, 255 F.3d 446, 450-51 (7th Cir. 2001). To provide officials with sufficient notice, inmates must file grievances at the place and time and with the information required by the prison's administrative rules. *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Where the administrative rules are silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* at 650; *see Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

The PLRA does not require that a defendant be named in an inmate's administrative grievance. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007). Prison grievance procedures, not the PLRA, determine the level of specificity required in an inmate's administrative grievance:

> Compliance with the prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Id.* Drawing on principles of notice pleading, the Court of Appeals for the Seventh Circuit has held that, absent more stringent administrative requirements, an inmate need not state "facts, legal theories, or demand relief," so long as the grievance objects "intelligibly to some asserted shortcoming." *Strong*, 297 F.3d at 650; *see Riccardo*, 375 F.3d at 524.

It is undisputed that on October 4, 2005, the plaintiff filed an inmate grievance relating to his claim that he was denied recreation. He complained that being confined in isolation for more than 30 days without any form of recreation constituted cruel and unusual punishment. The plaintiff also asserted that the "conditions in the isolation cells is cruel and unusual." (Bulanda Aff. ¶ 10, Ex. C at 1.) On October 5, 2005, the plaintiff filed an inmate grievance relating, in part, to cell illumination. He complained that cell lighting required him to place something over his face. (Bulanda Aff. ¶ 12, Ex. E at 1.) On November 14, 2005, the plaintiff filed an inmate grievance relating to recreation. He complained that his cell was "too small for jogging" and that "[a]ll it will accommodate is pacing or exercises such as sit ups or jumping jacks that inmates could do in their own cells." (Bulanda Aff. ¶ 11, Ex. D at 1.) This grievance also stated, "By my being mentally ill[], I need exercise activity and time outside of my cell." (*Id.*)

Pursuant to the Jail's Inmate Packet, an inmate's grievance "must be legible, on the proper form, signed, dated, and submitted without profanity." (Bulanda Aff. ¶ 7, Ex. B at 6.) There is no requirement concerning the level of specificity of inmate grievances. Thus, the standard is whether the plaintiff's grievances would have put the defendants on notice of the plaintiff's claims.

The plaintiff is proceeding on Eighth Amendment conditions of confinement claims based on denial of recreation and constant illumination as well as a deliberate indifference to mental health claim based on the conditions of confinement in segregation. The plaintiff's three inmate grievances

raise these issues. Based on the relevant legal authority and the fact that there is no indication that Jail rules require additional specificity in the content of inmate grievances, the court finds that these three inmate grievances are sufficient to exhaust the plaintiff's administrative remedies as to his claims in this case.[3]

## 2. Conditions of Confinement and Deliberate Indifference to Mental Health

The Eighth Amendment proscribes cruel and unusual punishment in cases of official conduct which is not part of the formal penalty for a crime if a plaintiff demonstrates: (1) a "sufficiently serious" deprivation and, (2) that officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To prevail on his Eighth Amendment claim, the plaintiff must show that he was subjected to conditions which denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison conditions cannot rise to the level of cruel and unusual punishment unless the conditions produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. The plaintiff must also show that the defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measure to abate it.

*Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

It is undisputed that the plaintiff was incarcerated at the Jail from August 3, 2005 until November 22, 2005. According to the defendants, inmates in segregation are allowed out of their

---

[3] Based on the foregoing, there is no need to examine the recently discovered additional inmate grievances that the defendants identified in their supplemental summary judgment materials. Therefore, the defendants' motion for leave to file a supplemental summary judgment brief and their corresponding motion for relief from the scheduling order will be denied as moot.

cell for one hour every day unless they are considered extremely dangerous and since the plaintiff was not considered extremely dangerous, he would have been allowed out of his segregation cell during this hour. According to the plaintiff, he was informed by defendant Sgt. Johnson that the Jail does not give inmates recreation while housed in segregation. The plaintiff also avers that while housed in segregation, he was never offered one hour a day out of his cell and he was not allowed to walk up and down the gangway.

The defendants aver that cell lights throughout the Jail are dimmed between the hours of 10:00 p.m. and 5:30 a.m. According to the defendants, the nighttime cell lights are only as bright as is necessary for Jail staff to monitor the safety and security of the inmates and staff. The Jail's nighttime lighting is maintained at a level compliant with Wisconsin Administrative Code requirements that there be sufficient light to conduct security checks. According to the plaintiff, cell lights in segregation were never dimmed during his confinement in segregation at the Jail. He avers that the cell lights were so bright in segregation that it disturbed his sleep, and caused him headaches and blurry vision.

"Lack of exercise may rise to constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). In *Thomas v. Ramos*, 130 F.3d 754, 762-64 (7th Cir. 1997), the court discussed the conditions of confinement related to the sufficiency of exercise in prison. The court held that there is no Eighth Amendment violation where a prisoner had room in his cell to do push-ups, sit-ups, jogging in place, and step-ups. *Id.* Alternatively, in *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001), the Seventh Circuit found the prisoner's Eighth Amendment claim viable, because "for 6 months, Delaney remained in a cell the size of a phone booth without any meaningful

chance to exercise." *Id.* at 684. The cells in the unit in which Delaney was confined "were small and cramped, measuring only about 122 inches by 43 to 56 inches," and were, at most, about 47.5 square feet in size - not all of which was space usable for exercise. *Id.* at 682.

In this case, it is undisputed that the plaintiff had ample space to exercise in his cell. Also, he was confined to segregation for three and one half months and he was there for security and safety reasons. This case is analogous to *Thomas v. Ramos*, and therefore, the court finds that the plaintiff did not suffer an Eighth Amendment violation based the denial of out-of-cell exercise while confined at the Jail.

Constant illumination may violate the Eighth Amendment if it causes sleep deprivation or leads to other serious physical or mental health problems. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (24-hour illumination by fluorescent lights not dimmed at night). The parties dispute whether cell lights in segregation were dimmed at night. However, it is undisputed that cell lights remained on for security reasons and that the Jail's lighting policy complies with Wisconsin Administrative Code regulations. Furthermore, the plaintiff states that he was able to cover his face with items to shield the light in order to sleep at night. It is undisputed that the plaintiff was observed sleeping while in segregation at the Jail. Finally, there is no evidence to suggest that the plaintiff was otherwise harmed as a result of constant illumination. The conditions as they relate to the plaintiff's mental health will be discussed *infra*.

The plaintiff spent less than four months in segregation status at the Jail. The conditions there, though not comfortable, have not been shown to produce the deprivation of a single, identifiable human need. The relatively short amount of time that the plaintiff spent in segregation, together with conditions that do not rise to the level of severity that other courts have found may

23

violate an inmate's rights, lead to the conclusion that the conditions in segregation do not implicate the Eighth Amendment. Thus, there is no need to determine whether the defendants acted with a sufficiently culpable state of mind. Accordingly, the defendants' motion for summary judgment with respect to the plaintiff's conditions of confinement claim will be granted.

The court now turns to the plaintiff's deliberate indifference to mental health claim. Deliberate indifference to the serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, and thus is proscribed by the Eighth Amendment. *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. at 834; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle*, 429 U.S. at 104-05; *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). To defeat the defendants' motion for summary judgment, the plaintiff must cite evidence from which it can be inferred that he had a serious mental health need and that prison officials were deliberately indifferent to this need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

It is undisputed that the plaintiff's cell assignment to segregation reflected his lack of compliance with Jail rules as well as his changing needs for observation, security, and monitoring. Although the plaintiff does not recall discussing his mental health history at booking, it is undisputed that the plaintiff answered questions related to his mental health history in the negative, indicating that he was not at risk for suicide. Inmates are told at booking that they may access various psychiatric services by telling an officer of their needs.

24

On September 19, 2005, the plaintiff authorized release of his mental health records and these records revealed prior diagnoses of mental illness. On September 28, after receiving the records, the plaintiff was placed on suicide watch, which was discontinued on October 3, 2005. On October 5, 2005, the plaintiff notified Jail medical staff that he would be refusing to eat or drink anything and on the same day the plaintiff threatened to break a light fixture and cut himself. A crisis worker was called to speak with the plaintiff and the worker recommended that he remain in segregation with thirty minute checks. In addition, the plaintiff was moved to a cell appropriate for monitoring his food intake.

On October 7, 2005, Sister Ginny informed defendant Reid that the plaintiff wanted to speak to a crisis worker. Before the crisis worker arrived, the plaintiff was found with a bed sheet tied around his neck and the cell bars. The plaintiff received medical attention and was placed on suicide watch. On October 9, 2005, the plaintiff voluntarily resumed eating and drinking and he was seen by Dr. O'Keefe every 48 hours between October 10 and October 18. On October 18, 2005, the plaintiff was removed from suicide watch and continued to be housed in segregation to serve disciplinary sanctions.

The first question is whether the plaintiff had a serious medical need. For the purposes of deciding the defendants' motion for summary judgment, the court assumes that the plaintiff's mental health issues qualify as a serious mental need. *See Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (it is well-settled that suicide is an objectively serious harm).

The next question is whether by placing the plaintiff in segregation, the defendants were deliberately indifferent to the plaintiff's serious medical need. In that regard, the court is mindful that, in most cases, managing prisons is not a job for the federal courts:

> Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state ... how to run its prison system.

*Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006) (officials at the Wisconsin Secure Program Facility did not unconstitutionally subject homicidal schizophrenic inmate to cruel and unusual punishment, absent evidence that they knew conditions of confinement, i.e., heat, constant illumination, and lack of sound, were making his mental illness worse) (quoting *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985)).

In this case, the undisputed facts reveal that the plaintiff was questioned about his mental health upon arriving at the Jail. Later, after the plaintiff's prior mental health records were received, the plaintiff was placed on suicide watch. When the plaintiff notified staff that he would be refusing to eat or drink, he was moved to a cell appropriate for monitoring his food intake. The plaintiff's progress was monitored by crisis intervention workers and medical staff. In short, the record reveals that the plaintiff received prompt medical attention in response to his mental health issues. The record does not support a finding of deliberate indifference on the part of any defendant. Thus, the defendants' motion for summary judgment will be granted.

26

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #39) be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the defendants' motion for leave to file supplemental summary judgment pleadings (Docket #60) be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the defendants' motion for relief from the Scheduling Order (Docket #60) be and hereby is **DENIED AS MOOT**; and

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

**SO ORDERED** this 7th day of March 2007, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge